1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SACRAMENTO COUNTY RETIRED
     EMPLOYEES ASSOCIATION; et al.,
12
                 Plaintiffs,                    No. CIV S-11-0355 KJM-EFB
13
          vs.
14
     COUNTY OF SACRAMENTO,                      ORDER
15
                 Defendant.
16   _____/

17          This matter comes before the court upon defendant's motion for summary

18   judgment.  The court heard argument on June 28, 2013.  Mark Merin appeared for plaintiffs;

19   Krista Whitman appeared for defendant County of Sacramento.  Following hearing, the court

20   allowed brief supplemental filings, after which the matter was submitted.  After considering the

21   parties' briefing and arguments at the hearing, the court GRANTS defendant's motion for

22   summary judgment.

23   I.   BACKGROUND

24          On February 8, 2011, plaintiffs Sacramento County Retired Employees

25   Association ("SCREA"), Prestwich, Rogers, Harding, Abernathy, Remson and Flores

26   (collectively "plaintiffs") filed a putative class action complaint against the County of Sacramento

1

("County") on behalf of four subclasses[1] of retired Sacramento County employees, challenging the County's decision to reduce or terminate a health and dental insurance subsidy for several classes of employees.  Compl., ECF No. 1.   Plaintiffs allege that since 1980, defendant has provided medical and dental insurance subsidies that assisted County retirees with their medical and dental insurance premiums through the Sacramento County Employee Retirement System ("SCERS"). ECF No. 1 ¶ 2.  From 1993 to 2002, the Sacramento County Board of Supervisors ("Board") provided the subsidies "by resolution and set the amount at the highest HMO premium for non-Medicare eligible retirees."  *Id.*  The Board froze the subsidy in 2003 at a maximum of $244 per month for medical insurance and a flat rate of $25 per month for dental insurance premiums, without distinguishing between former employees based on management status or union representation.  *Id.*  In 2007, the Board adopted its Retiree Medical and Dental Insurance Program Administrative Policy for 2008, eliminating subsidies for employees who retired after May 31, 2007.  *Id.* ¶ 4.  Six unions representing their members who were County employees challenged this action before the California Public Employment Relations Board ("PERB"), which issued a decision on June 30, 2009; according to the complaint, PERB ordered defendant to rescind the subsidy cut.  (ECF No. 1 ¶¶ 4-5.)  The Board did so, but only for those current and prospective retirees who were represented by the unions in the claim before the PERB.  *Id.* ¶ 8.  In 2010, the Board reduced the medical insurance subsidy to a maximum of $144 per month and

---

[1] Subclass one consists of "[r]etirees who retired before June 1, 2007, and who were not represented by a union before the PERB who are currently receiving a maximum health insurance subsidy off-set of $80.64 each month."  Compl., ECF No. 1 ¶ 8.  Subclass two consists of "[r]etirees who were informed in 2007 that they would need to retire on or before May 31, 2007, in order to be eligible to receive the health insurance subsidy and who did retire prior to June 1, 2007, with the intent to remain eligible for the health insurance subsidy for the duration of their retirement who are now receiving a maximum medical insurance premium off-set for $80.64 each month."  *Id.*  Subclass three consists of "[r]etirees who retired after May 31, 2007, who were not represented by a union before the PERB and who are currently receiving no health or dental insurance subsidy off-set as a result of the changes enacted by the Sacramento County Board of Supervisors."  *Id.*  Subclass four consists of "[r]etirees who were represented by a union before the PERB who are receiving a maximum medical insurance subsidy of $244 each month with an additional $25 subsidy for dental insurance premiums plus 7% interest as a result of the PERB ruling."  *Id.*

1  eliminated the dental insurance subsidy for employees who had retired prior to June 1, 2007.  *Id.*

2  ¶¶ 3, 7.  In 2011, the medical insurance subsidy was reduced to a maximum of $80.64 per month.

3  *Id.* ¶ 3.

4  Plaintiffs allege four causes of action on behalf of themselves and their putative

5  subclasses: 1) violation of the contract clause of Article I, Section 10 of the U.S. Constitution;

6  2) violation of the contract clause of Article I, Section 9 of the California Constitution;

7  3) violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S.

8  Constitution; and 4) violation of the equal protection clause of Article I, Section 7 of the

9  California Constitution.  *Id.*

10  Defendant filed a motion to dismiss in lieu of an answer on April 1, 2011, arguing

11  there was no express contract, it could not be bound by an implied contract, and it had a rational

12  basis for treating the unionized employees differently.  ECF No. 8.

13  On March 31, 2012, this court denied the motion to dismiss, relying chiefly on the

14  California Supreme Court's decision in  *Retired Employees Association of Orange County., Inc.*

15  *v. County of Orange*, 52 Cal. 4th 1171, 1194 (2011) ("*REAOC III*"),[2] which found that "under

16  California law, a vested right to health benefits for retired county employees can be implied under

17  certain circumstances from a county ordinance or resolution."  *Id.* at 1194.  *See* ECF No. 33 at 5.

18  The court also concluded that whether the County could rationally treat the plaintiffs and their

19  putative classes differently than the unionized employees who secured a favorable PERB decision

20  was a question of fact not susceptible to resolution on a motion to dismiss.  *Id.* at 10.

21  Defendant filed its answer on April 12, 2012.  ECF No. 34.

22  The parties have stipulated to vacating the deadline for filing a class certification

23  motion pending resolution of the instant motion for summary judgment.  ECF No. 47.

24  /////

25

26  [2] For a discussion of the relevant series of *REAOC* cases, *see* pages 12 to 15 below.

1   II.  <u>EVIDENTIARY ISSUES</u>

2          Under Rule 56 this court may consider only admissible evidence in support of or in

3   opposition to summary judgment.  "It is well settled that only admissible evidence may be

4   considered by the trial court in ruling on a motion for summary judgment."  *Beyene v. Coleman*

5   *Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988); FED. R. CIV. P. 56(c)(2).  A court cannot

6   consider inadmissible hearsay in opposition to a motion for summary judgment.  *Orr v. Bank of*

7   *America*,  285 F.3d 764, 773–74 (9th Cir. 2002).

8          A.  Defendant's Request For Judicial Notice

9          The County has asked the court to take judicial notice of a number of official

10  records, including SCERS resolutions regarding the health insurance subsidies; staff reports to the

11  Board, also on the topic of the health insurance subsidies; and the PERB decisions stemming from

12  the County's changes to the subsidies.  Defendant's Req. for Jud. Notice, ECF No. 44.

13         Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice

14  of an adjudicative fact which "must be one not subject to reasonable dispute in that it is either

15  (1) generally known . . . (2) or capable of accurate and ready determination by resort to sources

16  whose accuracy cannot reasonably be questioned."  Courts have taken judicial notice of a Board

17  of Supervisors' resolution and of administrative decisions.  *Merced Irrigation Dist. v. Cnty. of*

18  *Mariposa*, ___ F. Supp. 2d ___, 2013 WL 1749904, at *20 (E.D. Cal. Apr 23, 2013) (taking

19  judicial notice of Board of Supervisors' resolution as matter of public record); *Lee v. City of Los*

20  *Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (stating a court may take judicial notice of matters of

21  public record); *Mack v. S. Bay Beer Distrib., Inc*., 798 F.2d 1279 (9th Cir. 1986), *disapproved on*

22  *other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) (taking

23  judicial notice of an administrative board decision).  As plaintiffs do not contest their authenticity,

24  this court takes judicial notice of the documents contained in ECF Nos. 44-1 through 44-5.

25  /////

26  /////

B.  Plaintiffs' Exhibits

Plaintiffs' counsel has submitted a number of exhibits attached to his declaration, including a copy of an article from *The Sacramento Bee*; a report submitted to the County by CPA Richard Green; the United States Governmental Accounting Standards Board (GASB) Statement 45, referenced in Mr. Green's report; and literature issued by the County's Department of Employee Relations and Benefits to new retirees.  In addition, counsel reports on the results of questionnaires he mailed to SCREA members in an effort to determine their understanding of the nature of the health insurance subsidy.

The newspaper article plaintiffs offer is hearsay: even if the statement plaintiffs seek to admit satisfies some hearsay exception, the author of the article has not provided a declaration affirming what County Counsel Ryan said.  *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991); *Green v. Baca*, 226 F.R.D. 624, 637-38 (C.D. Cal. 2005).  At oral argument, counsel conceded the article is hearsay; it is disregarded.

Plaintiff's counsel also attests to the results of a questionnaire he mailed to SCREA members.  The results of surveys are not automatically inadmissible; criticisms of the format of the questions or the manner in which the survey was taken generally go to weight, rather than admissibility.  *See Fortune Dynamic, Inc. v. Victoria's Secret Store Brand Mgmt.*, 618 F.3d 1025, 1036 (9th Cir. 2010).  In this case, because  counsel has not provided the questions, the court is unable to evaluate their format or content.  At oral argument, counsel described the questionnaire as "elaborate" and did not dispute opposing counsel's characterization that it called for narrative answers.  As the court cannot determine from counsel's description how he derived his conclusions from the narrative responses to the questionnaires, the court will not consider the summary.  *See Gibson v. Cnty. of Riverside*, 181 F. Supp. 2d 1057, 1071 (C.D. Cal. 2002) (declining to consider a chart under Rule 1006 when the county "ha[d] not even detailed with *any* particularity the methods employed in the investigation or its results." (emphasis in original)).

/////

1    Moreover, even though counsel said he mailed the questionnaire to all the SCREA

2    members he could locate, he does not explain what percentage of County retirees are SCREA

3    members.  Accordingly, the fact that 85 percent of those responding believed they were entitled to

4    a lifetime subsidy is of no weight.

5    III. ANALYSIS

6        A.    Standard

7        A court will grant summary judgment "if . . . there is no genuine dispute as to any

8    material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

9    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

10   resolved only by a finder of fact because they may reasonably be resolved in favor of either

11   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[3]

12       The moving party bears the initial burden of showing the district court "that there

13   is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477

14   U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish that

15   there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

16   475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts

17   of materials in the record . . .; or show [] that the materials cited do not establish the absence or

18   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

19   support the fact."  FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the

20   nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

21   material facts").  Moreover, "the requirement is that there be no *genuine* issue of *material*

22   fact . . . .  Only disputes over facts that might affect the outcome of the suit under the governing

23   /////

24   _____

25       [3] Rule 56 was amended, effective December 1, 2010.  However,  it is appropriate to rely
     on cases decided before the amendment took effect, as "[t]he standard for granting summary
     judgment remains unchanged."  FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010
26   amendments.

1   law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48

2   (emphasis in original).

3   In deciding a motion for summary judgment, the court draws all inferences and

4   views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at

5   587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a

6   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

7   issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.*

8   *Co.*, 391 U.S. 253, 289 (1968)).

9       B.    Undisputed Facts

10  As the admissible facts are generally undisputed, the court refers to the County's

11  Statement of Undisputed Facts and in some instances to Plaintiffs' Separate Statement of

12  Undisputed Facts as the sources of the following factual recitation. The court discusses the

13  impact of any relevant disputed facts in the discussion of the merits below.

14  In 1977, the County's Board of Retirement[4] approved a $25 a month health

15  insurance subsidy for retirees for the year 1978 only, but discontinued it for the year 1979. In

16  1980, the Sacramento County Board of Supervisors approved a plan to provide a premium

17  subsidy to retirees, not to exceed $30 a month, to be paid from the excess earnings account of the

18  retirement fund, which would be subject to annual reaffirmation by the Board of Retirement.

19  Pl.'s Response to Def.'s Statement of Undisputed Facts, ECF No. 48-1 ¶ 1. The resolution giving

20  effect to the subsidy stated it was payable only so as long as there were excess earnings available

21  in the retirement fund. ECF No. 48-1 ¶ 1. The Board of Retirement adopted the resolution and

22

23  [4] A county's Retirement Board is an administrative agency, created by the County Employees Retirement Law of 1937, which is independent from the county itself and which manages a county employee retirement system. *Bd. of Retirement of the Kern Cnty. Emp.*

24  *Retirement Ass'n v. Bellino*, 126 Cal. App. 4th 781, 791 (2005); *Howard Jarvis Taxpayers' Ass'n v. Bd. of Supervisors of Los Angeles Cnty.*, 41 Cal. App. 4th 1363, 1373 (1996)*;* CAL.

25  GOV'T CODE § 31450, et seq.

26

7

1  approved it on an annual basis until 1993.  *Id*.; Def.'s Response to Pl.'s Statement of Undisputed

2  Facts, ECF No. 50 ¶¶ 2–4.

3         In 1993, the Board of Supervisors issued a resolution that did several things,

4  effective June 30, 1994: it adopted Government Code section 31592.4; changed the funding

5  source for the retirees' subsidy so it would be paid from excess earnings from the Sacramento

6  County Employees' Retirement System; noted this arrangement would mean that health care

7  subsidies would remain non-taxable to retirees; and finally resolved it would make annual

8  determinations of the level of the retiree health benefit subsidy, if any.  ECF No. 48-1 ¶ 2; ECF

9  No. 44-2 at 18-19; ECF No. 50 ¶ 13.  The Board subsequently adopted governing rules for the

10  Retiree Health Care Benefits Program.  ECF No. 44-2 at 36-43.  Beginning in 1994, the Board

11  adopted a policy to govern eligibility for, and access to, health insurance plans and subsidies for

12  the subsequent year.  ECF No. 48-1 ¶ 4.

13         In 2003, the funding source changed from excess earnings from the SCERS system

14  to allocated charges to County departments.  ECF No. 48-1 ¶ 3; ECF No. 44-3 at 83.

15         In 2006, the Board made changes to the Retiree Medical and Dental Program

16  Administrative Policy, but later rescinded the changes.  ECF No. 48-1 ¶ 5.

17         On June 5, 2007, the Board adopted a Retiree Medical and Dental Insurance

18  Program Administrative Policy for 2008, which provided that those who retired on or before

19  May 31, 2007 would continue to receive the subsidy, but which eliminated the subsidy for all

20  those retiring after May 31, 2007.  ECF No. 48-1 ¶ 6; ECF No. 44-4 at 19-20, 26.  This change to

21  the policy of providing subsidies to retirees interrupted the practice that had until then been in

22  place for 27 continuous years.  ECF No. 50 ¶ 1.

23         Six unions filed unfair labor practice charges, challenging the County's failure to

24  meet and confer with union representatives before eliminating the medical and dental insurance

25  subsidy for current employees.  ECF No. 48-1 ¶ 6; ECF No. 44-5 at 10.  In January 2008, an

26  Administrative Law Judge (ALJ) held hearings on all the cases and issued Proposed Decisions in

1   each, concluding generally that the County breached its duty to meet and confer with a number of

2   unions.  ECF No. 44-5 at 20-21, 45, 67.  The ALJ proposed that the County cease and desist from

3   unilateral implementation of the policy and make those affected by the changes whole.  *Id*.  In

4   June 2009, PERB upheld the ALJ's decisions, finding that the County committed an unfair labor

5   practice by unilaterally implementing the changes in eligibility to participate in the subsidy

6   program without fulfilling its obligation to bargain in good faith, ordering the County to rescind

7   the change, and to make whole those impacted by the unlawful change.  ECF No. 44-5 at 4, 26,

8   50-51.  The County complied with the PERB order.  ECF No. 1 ¶ 8.

9          On June 10, 2008, while a final PERB decision was pending, the Board adopted its

10   annual Retiree Health Policy for the year 2009, making no eligibility changes.  On August 25,

11   2009, it adopted the Policy for 2010, reducing the subsidy to a maximum of $144 a month.  On

12   September 28, 2010, the Board approved the policy for 2011, this time reducing the subsidy to

13   $80.64.  ECF No. 48-1 ¶ 9.

14          For the last twenty years, since 1993, the Board's Retiree Health Policies have

15   expressly stated that the Retiree Health Program does not create any contractual, regulatory or

16   other vested entitlement to health care benefits; since 2003, the policies also state that subsidies, if

17   provided, are not a vested benefit.  ECF No. 48-1 ¶¶ 12-13.  In addition, in the years that the

18   subsidies were approved by the Board of Retirement, the resolutions provided the payments

19   would terminate after one year unless extended.  ECF No. 48-1 ¶ 14.

20          In addition, pension payroll inserts mailed from 1983 to 1997 informed retirees

21   about Board action on the subsidies, always observing that extensions of the subsidy were

22   effective for the period of a year.  Decl. of Suzanne Likarich & Ex. 45, ECF No. 43-1.  From

23   1983 to 1986, the inserts say "[t]his extension was granted, effective [date], for a period of one

24   year."  ECF No. 43-1 at 1-3.  In 1987 and 1989, the inserts say "[t]his extension was approved for

25

26

a period of one year . . . ." *Id.* at 4-5.[5]  In 1989, the inserts not only notified retirees that the

extension was for the period of a year, but also that the subsidy is not a vested benefit and is

"provided subject to annual review by the Board and may be cancelled whenever the Board

deems it appropriate."  ECF No. 43-1 at 5, 7-9.  In 1992, the insert notified retirees that the health

insurance subsidy had been reduced, though it was extended at this reduced level for a year.  ECF

No. 43-1 at 10.  During this same time period, letters from the County's retirement administrator

stated that the plan "does not create any contractual, regulatory, or other vested right or

entitlement to either present or future retirees . . . to any particular level of subsidization of health

care costs, or to subsidization at all."  *See, e.g.*, ECF No. 43-1 at 13, 15, 18.  Similarly, employee

handbooks stated generally that the subsidy is provided on a year-to-year basis, may be cancelled

or not renewed by the Board at any time, and is not a vested benefit; retirement checklists and

planning guides provided the same information.  *See, e.g.,* ECF No. 43-1 at 24, 26, 38; ECF

No. 43-2 at 23 (stating that the insurance offset "[i]s not a vested benefit and may be changed or

discontinued by the Board of Supervisors").

   SCREA itself sent periodic newsletters to its members and letters to the Board of

Retirement and thereafter to the Board of Supervisors, recognizing that the subsidy "must be

reapproved on an annual basis or "respectfully requesting that your Board authorize the

/////

---

  [5] Plaintiffs dispute this fact, noting that the inserts say that the subsidy is provided subject to annual review by the Board, "the understanding being that the amount of the subsidy might change depending upon the cost of the insurance premiums and the availability of funds for the subsidy."  ECF No. 48-1 ¶ 15.  The court quotes directly from representative inserts, finding their language undisputed.  To the extent plaintiffs ask the court to draw a particular inference, they have not cited to any evidence supporting the claimed inference and the court thus disregards their claimed dispute.  *Palila v. Hawaii Dept. of Land & Natural Res.*, 639 F.2d 495, 497 (9th Cir. 1981) ("[Parties] cannot withstand a motion for summary judgment by simply asserting that facts are disputed.  Sufficient evidence supporting a claimed fact must be submitted to create a genuine factual issue."); *Murphy v. Sebit LLC*, No. CV-12-1509-PHX-FJM, 2013 WL 1499003, at *1 (D. Ariz. Apr. 10, 2013) (stating that any disputed fact that a party does not support with admissible evidence is insufficient to defeat summary judgment); Fed. R. Civ. P. 56(c)(1)(A) (stating that a party asserting that a fact is disputed must support the assertion by citing to particular parts of material in the record).

1   continuance of the Health Insurance Premium Subsidy . . . and give consideration to increasing

2   the subsidy amount . . . ."  ECF No. 43-2 at 56, 62, 64.

3       C.      First and Second Causes of Action

4           Defendant argues that plaintiffs cannot succeed on a claim under either the state or

5   federal contract clauses because there was no contract between the County and its employees to

6   provide a full health insurance subsidy to employees after their retirement.  Def.'s Mem. P. & A.,

7   ECF No. 41 at 11.

8           Plaintiffs argue both that there is an implied contract and implied contractual term,

9   arising from the County's enactment of the Retiree Premium Subsidy and from "a multitude of

10  acts," including the County's practice since 1980 of enacting resolutions providing the subsidy,

11  the county's intent to use excess earnings to provide a subsidy, the County's adoption of

12  Government Code section 31592.4 to permit the payment of the subsidy in conformance with the

13  Internal Revenue Code, and the County's adoption of task force recommendations designed to

14  enhance the County's ability to guarantee continued subsidies.  Pls.' Mem. P. & A., ECF No. 15

15  at 9, 16.

16          i.  The Contract Clauses

17          The constitutions of the United States and California forbid the state from passing

18  laws that impair the obligation of contracts.  U.S. CONST. ART. I, § 10, cl. 1; CAL. CONST., ART. 1,

19  § 9.  To succeed on the Contract Clause claim, a plaintiff must show that "he or she has a contract

20  with the state, which the state, through its legislative authority, has attempted to impair."  *Univ. of*

21  *Hawaii Prof'l. Assembly v. Cayetano*, 183 F.3d 1096, 1101 (9th Cir. 1999).  The first inquiry has

22  three parts: "'whether there is a contractual relationship, whether a change in law impairs that

23  contractual relationship, and whether the impairment is substantial.'"  *RUI One Corp. v. City of*

24  *Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (quoting *Gen. Motors v. Romein*, 503 U.S. 181,

25  186 (1992)); *Hanford Exec. Mgmt. Emp. Ass'n v. City of Hanford*, No. 1:11-cv-0828-AWI-DLB,

26  2012 WL 603222, at *6 (E.D. Cal. Feb. 23, 2012); *Fourth La Costa Condominium Owners*

*Ass'n v. Seith*, 159 Cal. App. 4th 563, 584 (2008) (applying same analysis to California contract clause claim).  Defendant's motion addresses only the contractual relationship and relies on several recent cases to argue that no such relationship exists.  Plaintiffs counter that the same cases demonstrate there are disputed issues of material fact as to the existence of the contractual relationship, precluding summary judgment.

ii.  *Retired Employees of Orange County* and its Progeny

The relevant body of case law begins with a suit filed in the Central District by an association of Orange County retirees, challenging that county's decision to discontinue "pooling" the retirees with active employees to set rates for health care benefits, which ultimately led to higher premiums for the retirees.  *Retired Emp. Ass'n of Orange Cnty., Inc. v. County of Orange*, 632 F. Supp. 2d 983 (C.D. Cal. 2009) (*REAOC I*).  The district court rejected the retirees' argument that an implicit promise to continue the pooling arrangement arose from the Memorandum of Understanding (MOU) in that case and reasoned that only "explicit language in statutes or legislative enactments" gives rise to contractual obligations.  *Id*. at 986.

The retirees appealed to the Ninth Circuit, which certified the following question to the California Supreme Court: "Whether, as a matter of California law, a California county and its employees can form an implied contract that confers vested rights to health benefits on retired county employees."  *See Retired Emp. Ass'n of Orange Cnty v. County of Orange*, 610 F.3d 1099, 1101 (9th Cir. 2010) (*REAOC II*).

/////

/////

/////

/////

/////

/////

/////

1      The California Supreme Court's decision answering the certified question is the

2 first of the cases cited by both parties.  In that case, *REAOC III*, the court concluded:

> Although Government Code section 25300 does require that
> compensation of county employees be addressed in an ordinance or
> resolution, the statute does not prohibit a county from forming a
> contract with implied terms, inasmuch as contractual rights may be
> implied from an ordinance or resolution when the language or
> circumstances accompanying its passage clearly evince a legislative
> intent to create private rights of a contractual nature enforceable
> against the county.  Whether an implied term creates vested rights,
> in the absence of a legislative bar, is a matter of the parties' intent.

8 52 Cal. 4th at 1176-77.  The court began its analysis with an examination of California's law of

9 contracts, observing that contracts may be either express or implied and that even a written

10 contract may include implied terms "'derived from experience and practice.'"  *Id*. at 1178-79

11 (quoting *Scott v. Pac. Gas & Elec. Co*., 11 Cal. 4th 454, 463 (1995)).  It continued that implied

12 terms generally are treated the same as express terms, "provided that, 'as a general matter,

13 implied terms should never be read to vary express terms.'"  *Id*. at 1179 (quoting *Carma*

14 *Developers (Cal.), Inc. v. Marathon Dev. California, Inc*., 2 Cal. 4th 342, 374 (1992)).  The court

15 then turned to the certified question, which asked the court to decide, as relevant here, whether

16 counties can form implied contracts with their employees and whether implied contracts can

17 create vested rights.  *Id*. at 1179.[6]

18      In answering the first question, the court said that "[w]here the relationship

19 [between the county and the employees] *is* governed by a contract, a county may be bound by an

20 implied contract (or by implied terms of a written contract), as long as there is no statutory

21 prohibition against such an agreement."  *Id*. at 1183 (emphasis and parentheses in original).  The

22 court then turned to Government Code section 25300, which provides that a county board of

23 supervisors may fix compensation of county employees by resolution or ordinance, and

24

---

25      [6] As the County does not argue that there cannot be an implied vested right to health care,
this court does not discuss the third part of the California Supreme Court's analysis, answering
26 whether any such implied vested contractual rights can include health benefits.

concluded that "a court must look to Board resolutions, including those resolutions approving or

ratifying MOU's . . . to determine the parties' contractual rights and obligations." *Id*. at 1184-85.

The court added it did not need to decide whether a county may form an implied contract on

terms of compensation, because the retirees argued they sought recognition of an implied term of

a contract; it continued, "[t]hat matters of compensation must be addressed by resolution does not

necessarily bar recognition of implied terms concerning compensation." *Id*. at 1185.

Nevertheless, the court said that a resolution by a county board generally does not establish

contract rights because a resolution is generally a means to effect policy. *Id*.  It gave two

examples of when legislation does create contracts.  First, "[w]here . . . the legislation is itself the

ratification or approval of a contract, the intent to make a contract is clearly shown." *Id*. at 1187.

Second, "'a legislative intent to grant contractual rights can be implied from a statute if it contains

an unambiguous element of exchange of consideration by a private party for consideration offered

by the state.'" *Id*. at 1186 (quoting *Cal. Teachers Ass'n v. Cory*, 155 Cal. App. 3d 494, 505

(1984)).  The court concluded that "legislation in California may be said to create contractual

rights when the statutory language or circumstances accompanying its passage clearly . . . evince

a legislative intent to create private rights of a contractual nature enforceable against the

[governmental body]." *Id*. at 1187 (internal citation, quotation omitted, alteration in original).

The court cautioned, however, that "[a] court charged with deciding whether private contractual

rights should be implied from legislation . . . should 'proceed cautiously both in identifying a

contract within the language of a . . . statute and in defining the contours of any contractual

obligation,'" so that "neither the governing body nor the public will be blindsided by unexpected

obligations." *Id*. at 1188-89 (quoting *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe

Ry. Co*, 470 U.S. 451, 466 (1985)).  Accordingly a court must presume that legislation is not

intended to create contractual or vested rights; the party who claims an ordinance creates a

contract has the burden of overcoming the presumption. *Id*. at 1186

/////

1    In the second part of its opinion, the California Supreme Court rejected the

2 county's argument that it was impermissible to infer vested rights[7] and said that "[v]esting

3 remains a matter of the parties' intent" and can arise by implication.  *Id*. at 1189-90.  It noted that

4 whether the retirees had a contractual right to be part of a unified pool that vested when they

5 retired was beyond the scope of the Ninth Circuit's question, but said that "as with any

6 contractual obligation that would bind one party for a period extending far beyond the term of the

7 contract of employment, implied rights to vested benefits should not be inferred without a clear

8 basis in the contract or convincing extrinsic evidence."  *Id*. at 1191.

9    After receiving the Supreme Court's decision, the Ninth Circuit remanded the case

10 to the district court "for further proceedings consistent with the answer provided by the California

11 Supreme Court."  *Retired Emp. of Orange Cnty. v. County of Orange*, 663 F.3d 1292 (9th Cir.

12 2011) (*REAOC IV*).  The district court again rejected the retirees' claim.  *Retired Emp. of Orange*

13 *Cnty. v. County of Orange,* Case No. SACV 07-1301 AG (MLGx), 2012 U.S. Dist. LEXIS

14 146637 (C.D. Cal. Aug. 13, 2012) (*REAOC V*).  An appeal of this ruling is pending in the Ninth

15 Circuit.  *Retired Emp. of Orange Cnty. v. County of Orange*, No. 12-56706 (9th Cir. Sep. 17,

16 2012) (*REAOC VI*).

17    In another recent case,  *Harris v. County of Orange*, 682 F.3d 1126 (9th Cir.

18 2012), the Ninth Circuit considered a challenge to Orange County's determination to restructure

19 the retirees' grant to be applied to their health insurance premiums, brought not by REAOC, but

20 by a different group of retirees.  The terms and conditions of the grant were contained in sections

21 of the MOU between the county and its active and retired employees and in personnel resolutions

22 for those employees not represented by a union.  *Id*. at 1129.  After the county adopted changes to

23

24    [7] A vested right is one that is "already possessed or legitimately acquired," generally after
    a person "has rendered services" in reliance on another's representations.  Contractual rights
25 arise from the parties' bargain or are implied by their conduct.  *Hanford Exec. Mgmt. Emp.*
    *Ass'n*., 2012 WL 603222, at *7.  "In the context of public employment, vested contractual rights
26 are the exception, not the rule."  *Id*. at *8.

the grant, the retirees filed suit, alleging that the grant was an implied term of the MOU and that they had a contractual right to receive it because its terms were part of the respective MOUs in effect when they retired.  *Id*. at 1130.

The Ninth Circuit first opined that "[i]n order to state a claim for a contractual right to the Grant, the Retirees must plead specific resolutions or ordinances establishing that right."  *Id*. at 1134.  It said the retirees had not done so, but had asked the court to take judicial notice of a number of MOUs, two of which were accompanied by board resolutions adopting them.  *Id*. at 1135.  The Circuit found these MOUs did not help the retirees satisfy the pleading requirement because "[t]here are no terms or provisions in the MOUs, or in the Board resolutions adopting them, that guarantee the Grant will continue as the Grant existed in the MOUs in place on the dates of retirements.  Further, the referenced MOUs, including those adopted by the Board of Supervisors, contain durational language."  *Id*. at 1135.  Typical of the durational clauses was this language: "This Memorandum of Understanding sets forth the terms of agreement reached . . . for the period beginning July 23, 1993 through June 23, 1994."  *Id*. at 1135 n.4.

The retirees in *Harris* argued that the durational terms were "merely generic statements" that should not be considered for purposes of a motion for judgment on the pleadings. The Ninth Circuit disagreed:

> the Retirees have failed to plead facts that suggest that the County promised, in the MOUs or otherwise, to maintain the Grant as it existed on the Retirees' respective dates of retirement.  The Retirees also argue that the durational clause in the MOUs is not an indication of when the terms of the MOUs expire.  That may be so, but the durational clause surely cannot be the source of a claim that the benefits survive indefinitely."

*Id*. at 1135.  The Circuit did find that the district court should have granted the retirees leave to amend because there were other MOUs adopted by the board that might provide a basis for their claim.  *Id*.

The Ninth Circuit returned most recently to the issue of public employee rights in *Sonoma County Association of Retired Employees v. Sonoma County*, 708 F.3d 1109 (9th Cir.

1    2013).  In that case, the Association alleged the county had breached an obligation to provide

2    vested healthcare benefits in perpetuity.  The district court dismissed the original complaint

3    because the Association had not identified resolutions or ordinances creating an express contract

4    for healthcare benefits.  *Id.* at 1113.  The Association then sought to amend, offering copies of

5    resolutions, MOUs and ordinances, and stating it would provide evidence of the county's intent

6    "through the testimony of the employees who drafted the County's resolutions and policies, and

7    through a member of the Board of Supervisors, who would testify as to the Board's promises and

8    intent . . . ."  *Id.*  The district court nevertheless dismissed the complaint without leave to amend

9    and the Association appealed.

10              On appeal, the Circuit began by examining *REAOC III*'s resolution of the certified

11   question and from that distilled the pleading requirements for the claim before it:  the "complaint

12   must plausibly allege that the County: (1) entered into a contract that included implied terms

13   providing healthcare benefits that vested for perpetuity; and (2) created that contract by ordinance

14   or resolution."  *Id.* at 1115.[8]  The Circuit found the Association had satisfied the first of the

15   requirements by alleging that the board had ratified MOUs, which included provisions for county

16   contributions toward retiree health premiums for those hired after 1990 who had worked for the

17   county for at least ten years; and that the benefits were vested for perpetuity based on the county's

18   "long-standing course of conduct" and claims that employees who had drafted various documents

19   would testify about the background and intent.  *Id.* at 1116.  It found, however, that the

20   Association had not plausibly pointed to a resolution or ordinance that created the contract

21   implying the benefits and so returned the case to the district court to permit plaintiffs to amend

22   the complaint.  *Id.* at 1118.

23   /////

24

25         [8]  The Circuit in the decision cited here addresses only two of the *REAOC* cases; the
     decision refers to the Supreme Court decision identified in this order as *REAOC III* as *REAOC*
26   *II*, and to the Circuit's 2010 decision identified here as *REAOC II*, as *REAOC I*.

iii.  Application of Law to this Case

a.  Alleged Express Contract

As noted above, in the complaint, plaintiffs allege "there existed a contract between the COUNTY and its employees (now Plaintiff retirees) to provide a substantial health subsidy to its employees upon their retirement, which constituted deferred compensation during the employment relationship that vested upon retirement."  ECF No. 1 ¶¶ 50, 55 (capitalization in original).  In their opposition to the motion for summary judgment, plaintiffs argue there is an implied contract arising from "a multitude of acts."  They acknowledge that the legislation effectuating the subsidy "does not itself expressly provide for indefinite entitlement to the subsidy," but argue that implied terms can be inferred from evidence derived from experience and practice.  ECF No. 48 at 10.

In their Separate Statement of Undisputed Facts, plaintiffs aver that under various contracts between the County and the County-sponsored medical plans, SCERS was required to maintain a minimum level of subsidy for the retirees' medical coverage.  ECF No. 48-2 ¶ 5.  They cite to a report provided to the Board of Supervisors by the Retiree Health Benefit Task Force concerning Government Code section 31592.4.  The report said that "[e]xisting contractual arrangements with your Board and the Sacramento County-sponsored medical plans require a minimum level of subsidies for SCERS retirees' medical plan coverage," and suggested that should the subsidies be discontinued, these contractual rights might be violated.  ECF No. 44-2 at 3.  Plaintiffs have not presented copies of any such contracts, or pointed to anything else in the record supporting their claim that these contracts existed, or explained how their alleged status as third party beneficiaries of such contracts fits within the framework of the *REAOC* cases.  Plaintiffs thus have not raised a disputed issue of fact regarding the existence of an explicit contract.  Moreover, the same report provided to the Board of Supervisors confirms this conclusion; it says that "[p]rovision of these health benefit subsidies has been on an 'annual review' basis.  They are not legally considered 'vested' benefits.  They may be lowered or

1  eliminated entirely whenever the SCERS Board deems it to be prudent, appropriate and

2  necessary, e.g., whenever excess interest earnings are inadequate or nonexistent.  Annuitants are

3  advised annually of the tentative nature of these benefits."  ECF No. 44-2 at 1.

4                            b.  Retirement Fund Earnings

5             Next, plaintiffs have presented the declaration of John L. Benbow, who served on

6  the County Board of Retirement from 1980 through 1986 and who avers that the Retirement

7  Board would intentionally underestimate the expected earnings of the retirement fund every year,

8  which then resulted in a surplus when compared to actual earnings, which in turn were used to

9  fund the health insurance subsidy.  ECF No. 48-8 ¶¶ 2-4.  Benbow avers that he does not know

10  when this practice was discontinued and asserts his belief that the Retirement Board's actions

11  reflect County policy.  ECF No. 48-8 ¶ 6.  Plaintiffs have presented no other evidence suggesting

12  that this practice was in fact County policy; nor do they point to any authority that a practice

13  admittedly discontinued at some unknown time gives rise to an implicit promise to fund the

14  subsidy in perpetuity.  Moreover, even Benbow describes this method as a matter of policy and

15  says nothing about the Board's ratification of the practice in ordinance or resolution.  *See*

16  *REAOC*, 52 Cal. 4th at 1185 ("'Policies, unlike contracts, are inherently subject to revision and

17  repeal . . . .'") (quoting *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466)).

18                            c.  Legislation

19             Former County Executive Robert E. Smith declares he believes and believed that

20  legislation drafted by the Retiree Health Insurance Task Force and adopted by the Board in 1991

21  would guarantee retirees' access to the subsidy and provides a letter expressing that belief; he

22  does not, however, attach the legislation he discussed in that letter.  Decl. of Robert E. Smith,

23  ECF No. 48-17 ¶ 3.  At argument,  plaintiffs clarified that the legislation Robert E. Smith

24  referenced was the County's adoption of the resolution making the provisions of Government

25  Code section 31592.4 operative in the county which, according to the report, would bring the

26  County in compliance with IRS requirements.  *See* ECF No. 44-2 at 2.  Plaintiffs have presented

nothing else showing that the County's ultimate determination to make Government Code section 31592.4 operative and Task Force's examination of ways to fund the premium subsidy "if any" translates to a contractual promise to fund the subsidy in perpetuity.  ECF No. 44-2 at 18.  Indeed, the Resolution adopting the Rules for the Retiree Health Care Benefits Program says that the Board deems it "necessary to comply with federal tax law in order to preserve the tax qualified status of the retirement plan; and also intend to provide the benefits established hereunder without creating any contractual, regulatory or other vested entitlement thereto in present or future retirees . . . ."  ECF No. 44-2 at 36.  The Rules adopted by this resolution also say that they were intended to ensure that the annual subsidy complies with federal law and "to prevent the vesting . . . of any right to payment of the cost of future health care benefits . . . ."  ECF No. 44-2 at 38.

Gary Cassady was a member of the Retiree Health Insurance Task Force, which contracted with a consulting group to provide twenty-year cost estimates for retiree health plans. The task force also prepared legislation, which the Board enacted in 1993, effective 1994.  Decl. of Gary Cassady, ECF No. 48-9 ¶¶ 2, 4, 6.  Although Cassady says he believed that the legislation "would effectively guarantee" the subsidy because it would be drawn from a more stable funding source, the legislation itself says that the Board and its retirement system deem it necessary to comply with federal tax law and "intend to provide the benefits established hereunder without creating any contractual, regulatory or other vested entitlement thereto in present or future retirees, their spouses or dependants."  *Compare* ECF No. 48-9 ¶ 5 *with* ECF No. 48-11 at 5.  As noted, the resolutions adopted in the wake of this report explicitly deny any intent to create a vested benefit.  Mr. Cassady's declaration does not establish a disputed issue of fact.  *See Virtusio v. Fina. Indus. Reg. Auth.*, No. 12-cv-00602 NC, 2013 WL 1899830, at *6 (N.D. Cal. May 7, 2013) ("'The issue is whether the employer's words or conduct, on which an employee reasonably relied, gave rise to that *specific* understanding.'") (quoting *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 342 (2000)) (emphasis in original).

/////

1        d.  GASB Provisions

2            In 2006, the County sought the opinion of CPA Richard Green about the impact of

3   Government Account Standards Board ("GASB") provisions on the retiree health insurance

4   program.  Decl. of Mark Merin, ECF No. 48-3 ¶ 3.  Plaintiffs' counsel quotes selectively from

5   Mr. Green's analysis to suggest that the GASB accounting requirements imposed an obligation on

6   the county.  In the introduction to the report, however, Green said, "[b]ecause funding the

7   Program requires annual authorization from the County Board of Supervisors and there are no

8   vested benefits associated with the Program nor have the County management made any

9   guarantees or promises to continue the Program, we believe the County does not have a legal

10  obligation to continue the Program."  ECF No. 48-5 at 2.  Green concluded that for purposes of

11  accounting and financial statement reporting, the plan exists as a mutual understanding between

12  the County and the retirees.  *Id.*  at 3.  Even this latter conclusion does not raise a disputed issue

13  of fact as to the County's intent, as there is no indication in the evidence that Green was

14  authorized to speak for the County.  *See City of San Diego v. Haas*, 207 Cal. App. 4th 472, 495

15  (2012) (statements by city's retirement board could not give rise to implied contract for benefits

16  because the court could "only look to whether the City Council, and not SDCERS, intended to

17  grant vested rights . . . .").

18        e.  Retiree Declarations

19            Plaintiffs have also offered declarations from retirees, who say that they were

20  assured that the subsidy would become vested upon retirement and that they accepted County

21  employment in part on that promise or that retirement counselors assured them "not to worry

22  about language pertaining to discontinuation of the subsidy, because there was no reason to

23  suspect it would be discontinued as long as retirement benefits remained the same, even if the

24  County experienced a "'bad' year" or that retirement counselors did not inform retirees of the

25  potential that the subsidy might be discontinued."  *See, e.g.*, Decl. of Penelope Clark, ECF No.

26  48-12 ¶ 2; Decl. of Judy Cook, ECF No. 48-13 ¶¶ 2-3; Decl. of Donald Savage, ECF No. 48-15

¶ 2.  Plaintiffs have presented only one unequivocal statement from a human resources employee that the subsidy would vest upon retirement; the other, attributed to a retirement counselor, explicitly acknowledged that the benefit had to be renewed from year-to-year, but claimed that this was merely a formality.  This falls short of the "significant probative evidence tending to support [their] claim that material, triable issues of fact remain."  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (internal citation, quotation omitted).  Moreover, plaintiffs have not shown that these County employees were authorized to speak for the County or otherwise bind it.

### f.  Recruitment

In addition, Robert T. Smith, who was employed by the County Health Department, notes that it was difficult to recruit medical personnel because of the County's low salaries and that the subsidy was used as a recruiting tool.  Decl. of Robert T. Smith, ECF No. 48-19 ¶¶ 2-4.[9]  Smith's vague claim that the benefits were used as a recruiting tool is not supported by any recruiting materials prepared by the County promising the subsidy in perpetuity.

### g.  Implied Promise

None of the evidence reviewed above creates a disputed issue of material fact on the question whether the County created a contract that provided the subsidy to retirees with an implied term that the subsidy was vested in perpetuity.  The undisputed evidence shows that although the Board consistently ordered the subsidy to be paid over a period of time, it did so by adopting a policy, not a MOU or other contract.  *See REAOC III*, 52 Cal. 4th at 1187 ("Where, for example, the legislation is itself the ratification or approval of a contract, the intent to make a contract is clearly shown.").[10]  *See also Requa v. Regents of the Univ. of Cal.*, 213 Cal. App. 4th

---

[9] The court disregards Robert T. Smith's statement that employees detrimentally relied on the idea that the subsidy was vested and so did not transfer to jobs with better retirement health benefits.  To the extent the statement is within Mr. Smith's personal knowledge, it is based on hearsay.

[10] At argument plaintiffs' counsel asserted that every time the county approved an MOU including the subsidy, this was an implied understanding of the contractual obligation.  Plaintiffs have presented no evidence of any MOUs the County adopted, with or without the subsidy.

213, 227 (2013) (finding that Livermore Laboratory retirees sufficiently pleaded the existence of an implied contract for health benefits by showing the Regents authorized insurance coverage for retirees and offered to provide that coverage to Livermore retirees through benefit booklets and handbooks published by their authorized representatives).

It is true that a course of conduct may show an implied promise, but "'the very heart of this kind of agreement is an *intent* to promise,'" *Gorlach v. The Sports Club Co*., 209 Cal. App. 4th 1497, 1507 (2013) (internal citation omitted), and so the conduct alleged to provide the implied contract must give rise to the specific understanding sought to be enforced. *Guz v. Bechtel Nat'l., Inc*., 24 Cal. 4th 317, 352 (2000); *see also Foley v. Interactive Data Corp*., 47 Cal.3d 654, 679 (1988); Cal. Civ. Code §1621. The County has presented evidence showing it did not have the intent to promise. Plaintiffs' belief that they were entitled to receive the benefit for life is insufficient. *Gateway Rehab & Wellness Center, Inc. v. Aetna Health of Cal., Inc*., No. SACV 13-0087-DOC (MLGx),, at *3 (C.D. Cal. Apr. 10, 2013) (stating that "'the assumption, intention or expectation of either party alone, not made known to the other, can give rise to no inference of an implied contract'") (quoting *Travelers Fire Ins. Co. v. Brock & Co*., 47 Cal. App. 2d 387, 392 (1941)). The course of conduct in this case does not give rise to the specific understanding that the subsidy was part of the contractual exchange of labor for compensation in light of the County's continued stance that the subsidy was not guaranteed. Plaintiffs have offered nothing suggesting that a course of conduct with explicit restrictions can give rise to a unrestricted specific understanding. *See Harris*, 682 F.3d at 1135 (stating that the durational clause in a MOU "surely cannot be the source of a claim that the benefits survive indefinitely").

/////

---

Plaintiffs also claimed that the yearly Resolutions adopting the retirees' subsidy were probably simply boilerplate, adopted with little thought but have again provided no evidence supporting this claim.

1    Plaintiffs argue that in *Sonoma County*, the Ninth Circuit rejected *Harris* when, as

2   here, a plaintiff relied on implied in fact contract rights.  Plaintiffs read *Sonoma County* in too

3   limited a fashion.  In discussing *Harris*, the Ninth Circuit recognized that "the express terms of

4   the MOUs and resolutions at issue do *not* establish a specific end date to healthcare benefits, and

5   the Association alleges that the right to healthcare benefits in perpetuity is an *implied* term of a

6   contract, not an express contractual right."  *Sonoma Cnty.*, 708 F.3d at 1119, n.7.  The court thus

7   did not say a durational clause is irrelevant when a party alleges that there is an implied term

8   granting retirees the right to benefits in perpetuity.

9                              h.  Collective Bargaining

10    At hearing, plaintiffs argued that the subsidy is a mandatory subject of bargaining.

11   Under California Government Code section 3505, "[t]he governing body of a public agency . . .

12   shall meet and confer in good faith regarding wages, hours, and other terms and conditions of

13   employment with representatives of such recognized employee organizations . . . and shall

14   consider fully such presentations as are made by the employee organization . . . prior to arriving

15   at a determination of policy or course of action."  *See Coachella Valley Mosquito &Vector*

16   *Control Dist. v. California Public Emp't. Relations Bd.*, 35 Cal. 4th 1072, 1083 (2005).  Indeed,

17   the PERB upheld the ALJ's conclusion that the County's refusal to bargain constituted an unfair

18   labor practice.  Yet the fact that something might be a mandatory subject of bargaining does not

19   mean a bargain was struck or that the subject of bargaining becomes part of a contract absent the

20   Board's adoption of an MOU including terms guaranteeing the subsidy.  As noted above,

21   plaintiffs have presented no MOUs in opposition and their own evidence shows that the subsidy

22   was not a bargained-for provision:  retired Deputy Sheriff Robert Denham, Jr. avers that he

23   attended at least five different bargaining sessions, and that one of the top demands was retiree

24   health benefits because the bargaining units wanted to ensure that benefits were protected.  Decl.

25   of Robert Denham, Jr., ECF No. 48-14 ¶¶ 2-3.  At each session, the County refused to discuss the

26   subsidy, taking the consistent position that the subsidy "would not be in the contract and would

1    not be a subject of bargaining." ECF No. 48-14 ¶ 4.  This position is manifested by the policies

2    themselves, which say nothing about any bargained-for exchange.  None of plaintiffs' evidence

3    clearly evinces the County's intent to enter into a contract for payment of the health insurance

4    premium subsidy in perpetuity.

5            Defendant is entitled to summary judgment on the first and second causes of

6    action.

7        D.    Third and Fourth Causes of Action

8            Section one of the Fourteenth Amendment provides that no state shall "deny to any

9    person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

10   Section 7(a) of Article I of the California Constitution provides: "A person may not be . . . denied

11   equal protection of the laws . . . ."  CAL. CONST. art. I, § 7(a).  "California courts read the

12   rationality review component [of] the Equal Protection clause contained in Article I, section 7, of

13   the California Constitution as 'coextensive with its federal counterpart.'"  *Katz v. Children's*

14   *Hosp.*, 28 F.3d 1520, 1529 n.9 (9th Cir. 1994) (quoting *Dept. of Developmental Servs. v. Ladd*,

15   224 Cal. App. 3d 128, 129 (1990)); *see also Safeway Inc. v. City & Cnty. of San Francisco*, 797

16   F. Supp. 2d 964, 971 (N.D. Cal. 2011) ("The equal protection provision of the California

17   constitution is substantially the same as the equal protection clause of the Fourteenth Amendment

18   to the United States Constitution and, thus, may be analyzed under the same standard.").

19           States may "treat different classes of persons in different ways"; however,

20   classifications "must be reasonable, not arbitrary, and must rest upon some ground of difference

21   having a fair and substantial relation to the object of the legislation, so that all persons similarly

22   circumstanced shall be treated alike."  *Reed v. Reed*, 404 U.S. 71, 75-76 (1971) (internal citations

23   and quotation omitted); *see also Creighton v. Regents of the Univ. of Cal.*, 58 Cal. App. 4th 237,

24   246 (1997) ("Equal protection requires that persons similarly situated with respect to the

25   legitimate purpose of the law receive like treatment.").

26   /////

1    Here, rational basis scrutiny applies. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)

2  ("unless a classification warrants some form of heightened review because it jeopardizes exercise

3  of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the

4  Equal Protection Clause requires only that the classification rationally further a legitimate state

5  interest.").  "In general, the Equal Protection Clause is satisfied so long as there is a plausible

6  policy reason for the classification, the legislative facts on which the classification is apparently

7  based rationally may have been considered to be true by the governmental decisionmaker, and the

8  relationship of the classification to its goal is not so attenuated as to render the distinction

9  arbitrary or irrational."  *Id.* at 11 (internal citations omitted).

10    Defendant here argues that the employees covered by the PERB decisions are not

11  similarly situated to the non-unionized employees because the latter group of retirees are former

12  members of unions that challenged the change in benefits and were covered by the PERB ruling

13  directing the County to make them whole.  ECF 54.  Plaintiffs suggest this distinction does not

14  matter, because frequently the non-unionized employees held the same jobs, but are now treated

15  differently, and the County has applied "an across-the-board denial of the subsidy to both union

16  and non-union retirees."  ECF No. 53 at 1.

17    In the Eleventh Circuit case of *Marshall v. Western Grain Co, Inc*., 838 F. 2d 1165

18  (11th Cir. 1988), the plaintiffs were union members who were not given severance pay when they

19  were laid off, even though other employees who did not have a collective bargaining agreement

20  did receive severance pay.  The union employees, all but one of whom were African American,

21  brought a Title VII action, alleging racial discrimination.  *Id*. at 1165-66.  The Eleventh Circuit

22  said that plaintiffs had not stated a claim of discrimination under Title VII, recognizing that

23  "because of their unique status in the workplace, bargaining unit employees are *never* similarly

24  situated with non-bargaining unit employees.  The unique treatment that employers give to

25  bargaining unit members is, of course, reflected best by the collective bargaining agreement."  *Id*.

26  at 1170 (footnote omitted; emphasis in original).  The court in *Marshall* recognized that an

1   employer may not modify the provisions of the collective bargaining agreement (CBA)

2   concerning wages, hours and other conditions of employment without bargaining.  *Id.* at 1170-71.

3   It concluded that

> [t]he plaintiffs . . . seek the opportunity to demonstrate that the
> defendants were motivated by race . . . in making payment of
> severance benefits, not by the collective bargaining agreement . . . .
> Although plaintiffs may be able to show that the employer gave to
> non-bargaining unit members all of the *tangible* benefits that were
> given to bargaining unit members, . . . they will not be able to show
> that the employer's decisions regarding non-bargaining unit
> members were restricted by the many *intangible* considerations
> inherent in collective bargaining.

9   *Id.* at 1171 (emphasis in original); *see also Davis v. Ineos ABS (USA) Corp.*, Civil Case

10  No. 09-773 JGW, 2011 WL 1114409, at *3-4 (S.D. Ohio Mar. 24, 2011) (noting that union

11  employees are not similarly situated to non-union employees in Title VII cases because "an

12  employer must often go through a complex process in order to discipline an employee covered by

13  a collective bargaining agreement").  The Eleventh Circuit has applied *Marshall* when evaluating

14  whether non-union employees are similarly situated to union employees as part of an equal

15

16  protection challenge.  *Donnell v. Lee Cnty. Port Auth.*, 509 F. App'x 903, at *2 (11th Cir. 2013)

17  (unpublished).

18          Plaintiffs argue that *Marshall* is not persuasive, as the Eleventh Circuit

19  distinguished it in *National Labor Relations Board. v. United States Postal Service.*, 888 F.2d

20  1568 (11th Cir. 1989).[11]  In that case, the NLRB sought information about discipline imposed on

21  supervisors who had engaged in gambling, but the Postal Service resisted, citing *Marshall* among

22

___

23  [11] Plaintiffs also cite to two California federal district court cases they say suggest
    *Marshall* is unpersuasive within the Ninth Circuit.  *See* ECF 53 at 2.  The court has reviewed
    both cases, which  declined to follow certain other cases relied on in *Marshall*; those courts'

24  determinations, however, were based on factual distinctions evident in determining whether or
    not to certify a class and do not signal that *Marshall* runs afoul of any established Ninth Circuit

25  precedent.  *See California State Employees' Ass'n v. California*, 1985 U.S. Dist. LEXIS 15974
    (N.D. Cal. 1985); *Walthall v. Blue Shield of California*, 1977 U.S. Dist. LEXIS 13773 (N.D. Cal.

26  1977).

other reasons. The court said that the information the NLRB requested had some bearing on whether the union employees were unjustly disciplined even though the supervisors had different responsibilities, as "the same rule prohibiting gambling activities is applicable to both unit employees and to supervisors." *Id.* at 1571. Plaintiffs here argue the County has applied an across-the-board denial of the subsidy to both union and non-union employees alike, making this case more like *National Labor Relations Board* than *Marshall*. (ECF No. 53.) However, nothing in *National Labor Relations Board* implicated the employer's reaction to and/or accommodation of a CBA. In contrast, in *Marshall* as in this case, the County has presented evidence that its actions were restricted by the considerations and limitations inherent in collective bargaining.

This court thus finds *Marshall* to have some persuasive force, as long as its pronouncement, that "bargaining unit employees are *never* similarly situated with non-bargaining unit employees," is not read as a blanket statement that applies without respect to the facts of a given case. In California, under the Meyers-Milias-Brown Act ("MMBA"), the County has a duty to bargain with employees' unions before changing wage or working conditions: "'The duty to bargain requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse . . . .'" *Coachella Valley*, 35 Cal. 4th 1072, 1083 (quoting *Santa Clara Cnty. Counsel Attorneys Ass'n v. Woodside*, 7 Cal. 4th 525, 537 (1994)). Plaintiffs have not pointed to a similar duty to bargain with non-union employees. And in this case, it was the County's failure to bargain that led to the PERB action. The remedies available to union employees means they are not similarly situated to non-union employees.

While one putative sub-class in this case consists of unionized employees whose unions pursued the action before PERB, both equal protection claims as pled compare the employees whose subsidy was reinstated because of the PERB action to those who did not appear before PERB. The one subclass cannot claim they were denied their right to equal protection given the way the issue is framed in the complaint.

1    Even if the non-unionized employees were similarly situated, plaintiffs still have

2    not rebutted the County's showing that the disparate treatment had a rational basis.  Under that

3    highly deferential level of review, the County "has no obligation to produce evidence to sustain

4    the rationality of a statutory classification," because "[t]he burden is on the one attacking the

5    legislative enactment to negative every conceivable basis that might support it."  *Heller v. Doe*,

6    509 U.S. 312, 320 (1993).  Here the County complied with the PERB order to make the unionized

7    employees whole, which satisfies the rational basis test.

8    Plaintiffs argue generally that the distinction between union and non-union

9    employees was not rational because PERB ordered the County to make all the employees affected

10   by the change whole.  ECF No. 48 at 23.  This argument is puzzling, for it suggests, without any

11   citation to authority, that the non-unionized employees were somehow in privity with the union

12   members or that PERB had the authority to issue sweeping orders unconstrained by the unfair

13   labor practice before it.

14   The California Legislature created PERB "to adjudicate unfair labor practice

15   charges: "'[t]he initial determination as to whether the charges of unfair practices are justified

16   and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter

17   within the exclusive jurisdiction of the board.'"  *San Diego Mun. Emp. Ass'n v. Superior Court*,

18   206 Cal. App. 4th 1447, 1456 (2012) (quoting CAL. GOV'T CODE § 3541.5) (emphasis omitted);

19   *see also* 8 Cal. Code Regs. § 32615(a) ("A charge may be filed alleging that an unfair practice or

20   practices have been committed.").  Nothing suggests that PERB has the authority to adjudicate

21   questions unrelated to unfair labor practices before it or that a finding of an unfair labor practice

22   can somehow be construed as a finding that the County had an implied contract to provide a

23   vested health care subsidy to all its employees.  This argument does not advance plaintiff's cause.

24   Defendant is entitled to judgment on these claims.

25   /////

26   /////

1       IT IS THEREFORE ORDERED that defendant's motion for summary judgment

2   (ECF No. 40) is GRANTED and this case is CLOSED.

3   DATED:  September 27, 2013.

4

5

6   _____
    UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26